**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| AMERICAN CHEMICALS & EQUIPMENT, INC. 401(K) RETIREMENT PLAN, | Case No. _____ |
| Plaintiff, | Related Case No.: 4:14-cv-00044-JAJ-HCA |
| vs. | **SECOND ANNIVERSARY COMPLAINT** |
| PRINCIPAL MANAGEMENT CORPORATION and PRINCIPAL GLOBAL INVESTORS, LLC, | |
| Defendants. | |

## I.    NATURE OF THE CASE

1.      American Chemicals & Equipment, Inc. 401(K) Retirement Plan ("Plaintiff") files this Second Anniversary Complaint following the two-year anniversary of filing its original Complaint, *American Chemicals & Equipment, Inc. 401(K) Retirement Plan v. Principal Management Corporation and Principal Global Investors*, 4:14-cv-00044-JAJ-HCA, (S.D. Iowa) (J. Jarvey).

2.      The Investment Company Act of 1940 ("ICA") limits recovery of damages to those incurred during the period one year before the institution of the action. *Id.* at § 36(b)(3). Therefore, unless a plaintiff files anniversary complaints, the temporal scope of damages is limited to one year before institution of the original complaint.  The Eighth Circuit has held that "the damage limitation yields only a retrospective limitation … [so] where the plaintiffs have continued to suffer damage during the litigation, both the language of the statute and the interests of judicial economy suggest that redress should be available in a single action" *Gallus v. Ameriprise Fin., Inc.* 561 F.3d 816, 825 (8th Cir. 2009), *vacated* on other grounds 130 S. Ct.

2340 (2010).  Out of an abundance of caution, Plaintiff, here, files this Second Anniversary Complaint.

3.     This Second Anniversary Complaint is similar to Plaintiff's original Complaint and First Anniversary Complaint.  In sum, Plaintiff's original Complaint alleges that in 2012 Defendants (defined below) received nearly *$80 million* in payments from the LifeTime Funds (defined below), and did virtually nothing to earn such an incredibly sizable fee.  Plaintiff's First Anniversary Complaint alleges in 2013 Defendants received more than *$102 million* in payments from the LifeTime Funds and did virtually nothing to earn the fee.  Here, Plaintiff alleges in 2014, Defendant's received more than *$118 million* in payments from the LifeTime Funds and did virtually nothing to earn the fee.  In this Second Anniversary Complaint, Plaintiff alleges that the payments Defendants receive from the LifeTime Funds in 2014 are under all the circumstances so disproportionately large that they bear no reasonable relationship to the services rendered by Defendants in exchange for the payments, and could not have been the product of arm's length bargaining.

4.     Principal Management Corporation ("PMC") and Principal Global Investors ("PGI") (collectively, "Defendants") violated the ICA by collecting from Plaintiff and other investors in the following mutual funds (for whom Defendants act as an investment advisor) excessive management fees: (1) Principal Lifetime Strategic Income Fund; (2) Principal LifeTime 2010 Fund; (3) Principal LifeTime 2020 Fund; (4) Principal LifeTime 2030 Fund; (5) Principal LifeTime 2040 Fund; and (6) Principal LifeTime 2050 Fund (*i.e.*, the "LifeTime Funds").

5.     The LifeTime Funds are so-called "funds of funds."  That is, each of the LifeTime Funds invests entirely in other mutual funds.  The LifeTime Funds, then, have privileges with respect to this group of other mutual funds; as explained further below, the LifeTime Funds and investors in them like Plaintiff have an interest in this group of securities based on the value thereof.  Put most simply, when the mutual funds owned by the LifeTime Funds rise in value, so, in turn, do the LifeTime Funds.  And vice versa when the mutual funds owned by the LifeTime

Funds decline in value.  Tellingly, these underlying mutual funds owned by the LifeTime Funds are all affiliated with Defendants. That is, they were created, managed and or controlled by Defendants and/or their affiliates.  The LifeTime Funds each invest in the same underlying pool of roughly twenty mutual funds.  Although the LifeTime Funds invest in the same pool of underlying mutual funds, what makes each individual LifeTime Fund different – for instance, the Principal Lifetime 2010 Fund as against the Principal Lifetime 2020 Fund – is that Defendants alter the allocation, or ownership percentage, of relative risky and relative conservative mutual funds in the fund mix for each Fund based on a particular target date, or retirement date (the approximate date the investor is expected to start withdrawing money from the LifeTime Funds). For instance, if an investor's retirement is anticipated to be near the year 2020, he or she could choose the Principal LifeTime 2020 Fund.  As that individual's anticipated retirement date approaches (in this example, 2020), the investment mix in the Principal Lifetime 2020 Fund becomes more conservative by increasing its investors' exposure to generally more conservative investment options.

6.      PGI is primarily responsible for developing and monitoring the risk profiles and for rebalancing risk profiles for each LifeTime Fund.  PMC is primarily responsible for portfolio construction decisions and the selection and monitoring of each underlying mutual fund in the LifeTime Funds.

7.      Defendants' marketing materials describe the LifeTime Funds' investment process with a graphic that appears as follows:

| Principal Lifetime Portfolios' Investment Process | | | |
|---|---|---|---|
| **Step 1:**<br><br>**Asset Class Selection** | **Step 2:**<br><br>**Glide Path Structure** | **Step 3:**<br><br>**Portfolio Construction** | **Step 4:**<br><br>**Disciplined Rebalancing** |

8.     Defendants explain that Step 1 is the selection of asset classes and their corresponding benchmarks.  Defendants select every asset class used in the Principal Funds. Defendants assert that every asset class must meet Defendants' proprietary eligibility requirements, including: (a) risk premiums are commensurate with the asset class risk profile; (b) the asset class provides diversification benefits; and (c) suitable implementation vehicles exists that permit efficient access to the asset class.

9.     Defendants explain that Step 2 is the design of the glide path for the LifeTime Funds.  To develop the glide path, PMC analyzes investing and spending scenarios using proprietary capital market assumptions and a variety of optimization and stochastic modeling tools.  The glide path reflects what PMC believes to be the optimal asset allocation mix for the time horizon of the unique LifeTime Funds.

10.    Defendants further explain that Step 3 in the investment process involves the selection and monitoring of the LifeTime Funds' underlying mutual fund investments and sub-advisors.  Defendants boast that their selection and management of sub-advisors for the LifeTime Funds provides a rigorous and disciplined framework for identifying, hiring, and retaining the premier sub-advisors within each asset class and investment style.

11.    Step 4 in the investment process is rebalancing.  Defendants' view rebalancing as a risk management service; thus, a primary focus is to control and manage systemic risks, not forecast short-term market trends.

12.    Defendants identify five individuals as in internal "Portfolio Managers" for the LifeTime Funds: (1) Jeffrey R. Tyler; (2) Dirk Laschanzky; (3) David M. Blake; (4) Randy L. Welch; and (5) James Fennessey.  Defendants' online biographies for these five individuals reveal that they provide services not just to the LifeTime Funds, but that they, among other things, oversee portfolio management and research conducted by investment teams involved in various traditional, alternative, and structured product strategies, serve on the boards of several affiliates and participate on research teams responsible for analyzing, interpreting and coordinating

investment performance data and evaluation of the investment managers under the due diligence process that monitors investment managers used by LifeTime Funds, Inc. (*See* Principal Financial Group, *Portfolios Manager Biographies,* available at https://www.principal.com/retirement/lifetime/main/bios.htm (last viewed on August 26, 2015).

13. Defendants collect what they call an Investment Management Fee from the Principal Funds for providing ***all*** of the services identified above. Defendants' Investment Management Fee is based not on any objectively assessed value for services provided to the LifeTime Funds, but, rather, as a percentage of the assets of the LifeTime Funds. As such, the more investor money that flows into the LifeTime Funds, the more fee revenue Defendants rake in – regardless of the objective value of the actual services that Defendants provide to the LifeTime Funds.

14. Defendants' Investment Management Fee for the LifeTime Funds at issue here is three basis points annually. Since 2001, more than $23 billion has flowed into the LifeTime Funds; consequently, Defendants have obtained in that time period more than $80 million in Investment Management Fees from the LifeTime Funds.

15. To be clear, Plaintiff here does not challenge the propriety of Defendants' assessment of its Investment Management Fee to investors like Plaintiff in the LifeTime Funds.

16. Instead, Plaintiff here challenges and seeks recovery of part or all of a fee charged to investors in the LifeTime Funds that Defendants call the Acquired Fund Fee. The Acquired Fund Fee is comprised of two parts: (1) an amount pocketed by sub-advisors to the LifeTime Funds and (2) an amount pocketed by Defendants from investors in the LifeTime Funds.

17. Defendants in the first instance pocket the entire Acquired Fund Fee from the LifeTime Funds as investor money. (*See, e.g.*, http://quote.morningstar.com/fund-filing/Prospectus/2012/2/29/t.aspx?t=PVASX&ft=&d=572a2816d3f488299edc0195ae15b8ba (prospectus for LifeTime 2010 R1 share class fund held by Plaintiff describing fees charged by Defendants and stating that the Acquired Fund Fee is a fee that "***you pay each year*** as a Percentage of the value of your investment") (emphasis added). Defendants retain a portion of

the Acquired Fund Fee and then pass down the remainder of the Acquired Fund Fee to the various sub-advisors to the LifeTime Funds. As such, the process by which Defendants collect this fee, retain portions of it for Defendants, and then distribute remaining portions of it to the LifeTime Funds' sub-advisors is illustrated in the following graph (the numbers used in the graph are rough estimates for 2014).



18. Defendants unilaterally decide how much in Acquired Fund Fees to charge and collect from the LifeTime Funds. Data demonstrates that the process by which Defendants decide how much in Acquired Fund Fees to charge and collect from the LifeTime Funds is arbitrary and capricious. The amounts charged and collected by Defendants from the LifeTime Funds, as demonstrated in the table below (*see* Paragraph 22), do not correspond to any value-added services that Defendants provide to the LifeTime Funds. Defendants simply "pad" the Acquired Fund Fee with an unreasonably lucrative profit margin for Defendants and use it as a pretext to transfer wealth of the LifeTime Funds to Defendants for their own benefit and to the detriment of the LifeTime Funds.

19. As noted above, the LifeTime Funds invest only in other mutual funds. The underlying mutual fund managers, or sub-advisors, provide, with minor exceptions, all day-to-

day investment management services for the underlying mutual funds.  To wit, Defendants admit in many solicitation materials and in numerous financial statement footnotes that "multiple sub-advisors [] are responsible for the day-to-day [investment] management responsibilities" of the LifeTime Funds.

20.     The sub-advisors' portion of the Acquired Fund Fee for the LifeTime Funds amounts to about 23 basis points (on average) annually.  In 2014, the sub-advisors' portion of the Acquired Fund Fee in dollar terms amounted to approximately $53 million.  The sub-advisors ostensibly earn their portion of the Acquired Fund fee by carrying out the day-to-day investment management work for all of the mutual funds owned by the LifeTime Funds.

21.     In 2014, Defendants' portion of the Acquired Fund Fee amounted to approximately $118 million – ***more than double that of the sub-advisors who actually provided the day-to-day investment management services for the LifeTime Funds***.  Defendants did little, if anything, to justify collecting $118 million in Acquired Funds Fees from the retirement investors of LifeTime Funds.  In essence, Defendants collected and retained about $118 million for mainly acting as a fee conduit to the sub-advisors for the LifeTime Funds.

22.     The table below summarizes the 2014 aggregate Acquired Fund Fees paid by the LifeTime Funds (at currently prevailing asset levels).

| Underlying Mutual Fund | Sub-Advisory Portion | Defendant's Portion | Total |
|---|---|---|---|
| Bond & Mortgage Securities | $3,451,828 | $14,359,511 | $17,811,339 |
| Bond Market Index | $518,304 | $2,242,686 | $2,760,990 |
| Diversified Int. | $1,593,005 | $14,064,612 | $15,657,617 |
| Diversified Real Asset | $3,966,996 | $4,396,371 | $8,363,367 |
| Equity Income | $460,751 | $2,934,264 | $3,395,015 |
| Global Div Inc. | $3,848,740 | $3,621,969 | $7,470,708 |

| Underlying Mutual Fund | Sub-Advisory Portion | Defendant's Portion | Total |
|---|---|---|---|
| Global Multi-Strategy | $7,265,391 | $4,915,408 | $12,180,799 |
| Global Opportunities | $4,155,141 | $3,458,691 | $7,613,833 |
| Global Real Estate Sec | $4,648,259 | $3,299,455 | $7,947,714 |
| High Yield Fund I | $508,933 | $560,876 | $1,069,808 |
| Inflation Protection | $583,914 | $2,232,320 | $2,816,234 |
| Intl Emerging Markets | $2,362,469 | $3,429,109 | $5,791,578 |
| Large Cap Growth | $524,789 | $1,453,257 | $1,978,045 |
| Large Cap Growth I | $4,305,078 | $7,115,275 | $11,420,353 |
| Large Cap S&P 500 Index | $339,168 | $3,289,297 | $3,628,465 |
| Large Cap Value | $481,315 | $3,104,194 | $3,585,509 |
| Large Cap Value III | $2,478,094 | $8,252,068 | $10,730,162 |
| MidCap | $369,814 | $1,953,710 | $2,323,524 |
| MidCap Growth III | $2,899,883 | $4,217,734 | $7,117,617 |
| MidCap Value III | $35,318 | $4,699,953 | $4,735,271 |
| Overseas | $3,143,403 | $16,263,752 | $19,407,154 |
| Short-Term Income | $579,325 | $1,917,826 | $2,497,151 |
| SmallCap Growth I | $2,429,609 | $3,217,017 | $5,646,626 |
| SmallCap Value II | $2,111,634 | $3,051,974 | $5,163,608 |
| Blue Chip | $1,771,869 | $3,189,364 | $4,961,234 |
| Origin Emerging Markets | $1,999,005 | $2,798,607 | $4,797,611 |
| **Total** | **$53,061,159** | **$118,051,327** | **$171,112,486** |

23.     The $53 million of the Acquired Fund Fee conveyed to the sub-advisors here indicates in light of the foregoing that the roughly $118 million of the Acquired Fund Fee retained by Defendants is grossly excessive and a clear breach of Defendants' statutory fiduciary duties to the LifeTime Funds.

24.     Again the sub-advisors here provided the day-to-day investment management services for the LifeTime Funds.  Yet Defendants nonetheless collected more than twice as much in fees as did the sub-advisors from the LifeTime Funds.  And for what?  Defendants collected nearly $118 million in exchange for little, if any, actual services provided to the LifeTime Funds.

25.     The amount of the Acquired Fund Fee that Defendants took from the LifeTime Funds is under all the circumstances so disproportionately large that it bears no reasonable relationship to the services rendered in exchange for that fee (if any) and could not have been the product of arm's length bargaining.  *See Jones v. Harris*, 559 U.S. 335 (2010) (investment advisors breach their fiduciary duties to mutual funds when they collect fees from mutual funds that are so disproportionately large that the fees bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining).

26.     Plaintiff seeks here recovery of damages resulting from Defendants' aforementioned breaches of duty, which includes a substantial amount of the compensation and payments received by Defendants from the LifeTime Funds via the Acquired Fund Fee.

27.     Plaintiff, with respect to its claims for a violation of Section 36(b) of the ICA seeks a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

28.     Plaintiff brings this action derivatively pursuant to Section 36(b) of the ICA on behalf of the LifeTime Funds.

29.     All conditions precedent hereto have been performed or have occurred.

## II.    THE PARTIES

30.    Plaintiff is a retirement plan of an Alabama corporation, which has its principal place of business in Birmingham, Alabama.  At all relevant times, Plaintiff was and is a shareholder of the LifeTime Funds.

31.    Defendant PMC is an Iowa corporation with its principal place of business in Des Moines, Iowa.  PMC has been registered with the Securities Exchange Commission ("SEC") as an investment adviser under the ICA since 1968.  PMC is an investment advisor to the Principal Funds.  As an investment advisor to the LifeTime Funds, PMC owes a fiduciary duty under the ICA to Plaintiff and all shareholders of the LifeTime Funds.

32.    Defendant Principal Global Investors ("PGI") is an Iowa corporation with its primary place of business in Des Moines, Iowa.  PGI is affiliated with PMC.  PGI is an investment advisor to the Principal Funds.  As an investment advisor to the LifeTime Funds, PGI owes a fiduciary duty under the ICA to Plaintiff and all shareholders of the LifeTime Funds.

## III.    JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

34.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3). Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in this district.

## IV.    BACKGROUND

35.    Congress recognized as early as 1935 that mutual funds "present[ed] special features which require[d] attention beyond simply the disclosure philosophy of the Securities Act of 1933." (*See* H.R. Rep. No. 91-1382, p. 2 (1970), because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the advisor.") (*See also* S. Rep. no. 91-184, p. 5 (1969)).

Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." (*Id.*) Rather, "the relationship between investment advisors and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker,* 441 U.S. 471, 481 (1979), and potentially incestuous." *Garternberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

36.     Accordingly, in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are ***adversely affected***…when investment companies are organized, operated [and] managed…in the interest of…investment advisers…rather than in the interest of [shareholders]…or when the investment companies…are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994) (emphasis added).  The ICA was designed to regulate and to curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors and distributors.

37.     In the 1960's, Congress realized that investment advisors were still gouging mutual funds with excessive fees.  A report produced by the Wharton School that was commissioned by the SEC found that investment advisers tended to charge mutual funds "substantially higher" rates than they charged other clients.  (*A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, p. 29 (1962)).

38.     As a result, Section 36(b), 15 U.S.C. §80a-35(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.  Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services, specifically providing that:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection

11

> . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

39.     Further, notwithstanding requirements regarding the increased disinterestedness of the board, "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund*, 464 U.S. at 540, also adding a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate ***under all the circumstances***.

15 U.S.C. § 80a-35(b)(2) (emphasis added). Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, giving them the ability to be an independent check on unfair fees while leaving "the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court." (S. Rep. 91-184, p. 6.)

40.     Mutual fund fees cause a dramatic decrease in investment returns over time. Arthur Levitt, past Chairman of the SEC, criticized this "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

(Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001).)

41.     When the Defendants start a new mutual fund, they not only contract to provide all the services the fund needs but they also nominate and elect the fund's board of directors.  The board of directors meets several times a year.  The directors are compensated for their services with a fee based on a schedule that takes into account an annual retainer, the number of meetings attended, and expenses incurred.  Directors are typically paid far in excess of $200,000 per year for serving on the board.  Mutual fund directors, in general, sometimes spend less than 50 hours per year working to protect the rights of mutual fund shareholders. As a result, mutual fund board membership, in general, and certainly with respect to the LifeTime Funds, is a very lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendants.

42.     While mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, two noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA.  Jack Bogle, founder of The Vanguard Group, Inc. ("Vanguard") made the following comment:

> ***Well, fund directors are, or at least to a very major extent, sort of a bad joke.***  They've watched industry fees go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser.  ***It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.***  (Emphasis added.)

43.     Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the following comment, which was aptly quoted by a United States District Court:

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money.  ***The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management—*** whether management was good, bad, or indifferent. Not negotiate for fee reductions and so on.  ***A long time ago, an attorney said that in selecting directors, the management companies were looking***

> *for Cocker Spaniels and not Dobermans.  I'd say they found a lot*
> *of Cocker Spaniels out there.*  (Emphasis added.)

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

44.     Mr. Buffet further observed, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an
> 'independent' mutual fund director will suggest that his fund look at
> other managers, even if the incumbent manager has persistently
> delivered substandard performance.  When they are handling their
> own money, of course, directors will look to alternative advisors –
> but it never enters their minds to do so when they are acting as
> fiduciaries for others. . . . Investment company directors have failed
> as well in negotiating management fees . . . If you or I were
> empowered, I can assure you that we could easily negotiate
> materially lower management fees with the incumbent managers of
> most mutual funds. And, believe me, if directors were promised a
> portion of any fee savings they realized, the skies would be filled
> with falling fees.  Under the current system, though, reductions
> mean nothing to 'independent' directors while meaning everything
> to managers.  So guess who wins? . . . [I]n stepping up to [their] all-
> important responsibilities, tens of thousands of "independent"
> directors, over more than six decades, have failed miserably.
> (They've succeeded, however, in taking care of themselves; their
> fees from serving on multiple boards of a single "family" of funds
> often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

**45.**     The watchfulness and effectiveness of mutual fund boards of directors continues

to be an issue today.  Indeed, as Judge Posner recently observed in his dissent from the denial of

a petition for rehearing en banc in another case brought under Section 36(b), there are "growing

indications that executive compensation in large publicly traded firms often is excessive because

of the feeble incentives of boards of directors to police compensation." *Jones v. Harris*, 537 F.3d

728, 730 (2008), *cert. granted*, 559 U.S. 335, 129 S. Ct. 1579 (2010).  Indeed, "'broad cross-

sectional analysis reveals little consistent evidence that board composition is related to lower fees

and higher returns for fund shareholders.'" *Id*. at 731 (quoting OEA Memorandum: Literature

Review on Independent Mutual Fund Chairs and Directors," Dec. 29, 2006).

## V.   SUBSTANTIVE ALLEGATIONS

46.    An investment advisor's fiduciary duty encompasses both full disclosure and substantive fairness as concerns fund fee assessments.  Indeed, an advisor "may not overreach in the amount of his fee even though the other party to the transaction, in full possession of all the facts, does not believe the fee is excessive."  December 17, 1969 Letter from the Investment Company Institute included with Mutual Funds Amendments (Part I): Hearings before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce, 91st Cong., at 441 (1969) ("1969 Hearings"). *See also* S. Rep. 91-184, pp. 15-16 ("the ultimate test, ***even if the compensation or payments are approved by the directors*** . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

47.    The essence of a claim for excessive or unfair fees under the Section 36(b) of the ICA is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."  *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939).  "To face liability under § 36 an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones v. Harris,* 559 U.S. 335, 346 (2010).

48.    The test for determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining includes consideration of the following six factors: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structure; (5) fallout benefits (*i.e.*, indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors.  A review of these factors, and the facts of this case, demonstrates that the fees collected by Defendants from the LifeTime Funds violate Section 36(b).

### *The Nature and Quality of the Services Rendered*

49.     The nature and quality of Defendants' services to the LifeTime Funds in exchange for Defendants' $118 million share of the Acquired Fund Fee is extremely limited.

50.     To put Defendants' retention of $118 million of the Acquired Fund Fee in proper context, worth noting is that Defendants collect in addition to this portion of the Acquired Fund Fee an Investment Management Fee for the services described in paragraphs 3 through 12 of this pleading.   Defendants do not provide additional services to the LifeTime Funds beyond those they perform in exchange for collecting the Investment Management Fee as described in paragraphs 3 through 12 of this pleading that would justify under Section 36(b) of the ICA Defendants' collection of roughly $118 million of the Acquired Fund Fee that Defendants charged Plaintiffs and other retirement investors in the LifeTime Funds.   Indeed, a comparison between the services Defendants provided to the LifeTime Funds in exchange for the Investment Management Fee (three basis points) and the services Defendants putatively provided to the LifeTime Funds in exchange for their retained portion of the Acquired Fund Fee illustrates beyond any question that Defendants' portion of the Acquired Fund Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining

51.     As noted above, a comparison of the services provided by the sub-advisors who provided the day-to-day investment services to the LifeTime Funds and took $53 million of the Acquired Fund Fee with the services provided by Defendants who ***did not*** provide day-to-day investment services to the LifeTime Funds in exchange for their share of the Acquired Fund fee yet nonetheless collected $118 million of the Acquired Fund Fees is further evidence that Defendants' portion of the Acquired Fund Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

52.     The increase in the amount of the Acquired Fund Fee that Defendants pocket from LifeTime retirement investors is yet another marker that illustrates Defendants portion of the

Acquired Fund Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. Defendants' portion of the Acquired Fund Fee was $80 million. In 2013, Defendants' portion of the Acquired Fund Fee was $102 million. In 2014, Defendants pocketed $118 million. Defendants' fees are skyrocketing without any corresponding increase is services rendered.

53.     By contrast, the LifeTime Funds' sub-advisors (the ones who provide all the day-to-day services to the LifeTime Funds) portion of the Acquired Fund Fee was roughly $52 million in 2013 and $53 million in 2014. So, while the sub-advisors' fees remained relatively constant, Defendants' increased their portion of the Acquired Fund Fee by nearly $16 million from 2013 to 2014.

54.     Defendants use the same or a similar pool of affiliated mutual funds to create the same or similar investment vehicles for Defendants' institutional and other clients as they use to confect the asset base of the LifeTime Funds, but at a dramatically lower cost than the fees Defendants collect from the LifeTime Funds at issue in this case.

55.     Despite the fact that the LifeTime Funds receive identical investment management services as Defendants' institutional and other clients, the LifeTime Funds pay Defendants dramatically higher Acquired Fund Fees because the fees are not negotiated in good faith at arm's length as they are with institutional and other clients that are not affiliated or controlled by Defendants the way the LifeTime Funds are controlled. Nor objectively are Defendants' fees (in terms of dollar amount) similar in any respect to fees one would see ensue from arm's length negotiations. This disparity in fees reflects Defendants' willingness and determination to prefer their own financial interests to the interests of the LifeTime Funds and the shareholders of the LifeTime Funds.

56.     By way of one example, Defendants are affiliated with an investment advisor named Edge Asset Management ("Edge"). Edge provides non-affiliated retirement plans and institutional investors with the same or similar investment management services that Defendants and the sub-advisors provide to the LifeTime Funds here.

57.     Edge represents itself as a leading manager of asset allocation strategies that employs a tenured team of 23 investment professionals.  Edge boasts that it is at the forefront of innovation in this field and asserts that it is a pioneer in target date fund risk allocation.  Edge further boasts that as an affiliate of PGI, it is able to employ the focus of a boutique firm while leveraging the resources of a global leader.  Defendants are certainly aware of Edge and the services it provides and the fees it charges for these services.  To be sure, Edge is even a sub-advisor to the LifeTime Funds.

58.     In an arm's length relationship, Edge would charge the LifeTime Funds no more than 23 basis points annually for the combined services that the LifeTime Funds are presently paying in excess of 100 basis points to receive.  That is, both the Investment Management Fee and the Acquired Fund Fee.  This means the entire portion of the Acquired Fund Fee that Defendants collect from the LifeTime Funds ($118 million in 2014) is grossly excessive.

59.     Defendants repeatedly put their own financial interests ahead of the interests of Plaintiff and other shareholders of the LifeTime Funds by participating in arrangements and schemes that benefit Defendants at the expense of Plaintiff and the LifeTime Funds.  The cost of this conflict of interest, which does not exist in the case of the arm's length relationships with institutional clients, is reified in the excessive fees complained of herein, but also in other losses borne by the LifeTime Funds.

60.     Defendants' willingness and determination to prefer their own financial interests to the interests of the LifeTime Funds and shareholders of the LifeTime Funds like Plaintiff shows through in the nature and quality of the services that Defendants render to the LifeTime Funds.  Again, Defendants contract with sub-advisors to provide the LifeTime Funds with the daily investment management services the LifeTime Funds require.  And yet, in 2014, Defendants collected nearly $171 million from the LifeTime Funds ostensibly for investment management services, while Defendants only conveyed about $53 million of that to the sub-advisors as ostensible compensation for their aforementioned investment management services.

Put bluntly, it is the sub-advisors who actually provide the vast majority of such investment management services as are provided to the LifeTime Funds.

61.     Additionally, even though the LifeTime Funds invest in mutual funds created, managed, and controlled by Defendants, Defendants nevertheless charge the LifeTime Funds sharp fees for Defendants to ostensibly monitor Defendants' own mutual funds.  One would expect that in an arm's-length relationship, there would be a fee discount (or no fee at all) associated with such purported monitoring.  But such is not the case here.  The LifeTime Funds are paying layers of unnecessary and excessive fees to their detriment and to Defendants' sole benefit.  This sort of fee gouging is precisely the sort that the ICA exists to restrain.

62.     To the extent that Defendants provide any legitimate services to the LifeTime Funds (apart from the services provided in exchange for the Investment Management Fee), in exchange for the roughly $118 million share of the Acquired Fund Fee, those services might include administrative services.  The nature and quality of any such ostensible administrative services – if such in fact are actually being performed by Defendants here – at any rate do not justify Defendants taking a roughly $118 million share of the Acquired Fund Fee from the Plaintiff and other investors in the LifeTime Funds.

### The Profitability of the LifeTime Fund to Defendants

63.     "[T]he profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" (*See* John P. Freeman & Stewart L. Brown, *Manual Fund Advisory Fees: The Cost of Conflicts Interest*, 26 Corp. L. 610, 661 (2001)).  The profitability of a fund to and adviser is a function of revenues minus the costs of providing services.  Defendants' reporting of their revenues and costs is intended to, and does, obfuscate Defendants' true profitability.

64.     Defendants' costs of providing advisory services to the LifeTime Funds, especially and specifically as it pertains to the portion of the Acquired Fund Fee retained by Defendants, are nominal while the fee award at bar received by Defendants is massively disproportionate

given the nature, quality, and of the services provided to the LifeTime Funds in exchange for the fee amount in question.

65.     The LifeTime Funds debuted in 2001.  The assets managed by Defendants within the LifeTime Funds have grown dramatically since then.  The Lifetime Funds now include over $20 billion in assets under management.  The revenues, net income, and profit margins deriving from the Principal Funds have been increasing exponentially.  Over that period, the immense growth of assets under management involved has generated substantial economies of scale to the great benefit of Defendants.

### *Economies of Scale*

66.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of mutual fund investment advisory services.  *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31; GAO Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9.

67.     The clearest example of these economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering).  In such instances, as the GAO confirms, it is possible for fund advisors (here, Defendants) to service additional assets with zero additional costs.  In other words, investment advisors like Defendants can advise a fund that doubles in size purely because of market forces with no increased costs because the services in question provided by the advisors remain unchanged.

68.     Economies of scale exist for the LifeTime Funds; they are not, however, being passed on to Plaintiff and other investors in the LifeTime Funds for their benefit as required by the ICA; instead, they simply are appropriated for the benefit of Defendants.  Thus, LifeTime

Fund shareholders have incurred actionable losses, because as their legal fiduciaries, Defendants are siphoning off for Defendants' benefit rather than for the benefit of the LifeTime Funds the monies made available by these economies of scale. The economies of scale benefits that have been captured and misappropriated by Defendants can and do generate huge excessive, undeserved profits for the Defendants. These profits have been improperly misappropriated from the LifeTime Funds by, in part, depriving them of the benefits of economies of scale. These benefits can (at least in part) be shared with the LifeTime Funds, Plaintiff and other shareholders in these funds by reducing fees and other costs charged to the funds by Defendants. In the case of the mutual funds at issue in this case, no such meaningful savings have been shared with the LifeTime Funds.

69.     The work required to operate a mutual fund does not increase proportionately with the assets under management. "[I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase long with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion." (Size may impair performance, but it imposes little logistical challenge.) (Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238.) Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." (*Id.*) Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." (*Id.*) According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering." (John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005)).

70.     As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars

($3,750,000).   Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

71.     It simply does not cost a fund's advisor ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.   In fact, the investment advisory services or securities selection process for a ten billion dollar fund and a one million dollar fund are virtually identical, generating enormous economies of scale.   At some point (exceeded by the fund because of their large size), the additional cost to advise each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

72.     Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b).   Further, as assets under management increase, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.   In the case of the LifeTime Funds, assets under management have grown, so have the advisory and distribution fees paid to Defendants grown dramatically, despite the economies of scale realized by Defendants.   As the fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are unfair, especially when the economies of scale are considered.

73.     The economies of scale enjoyed by Defendants with respect to the LifeTime Funds have not been shared with Plaintiff as required by Section 36(b).   As a result, the Acquired Fund Fees that Plaintiff and other investors in the LifeTime Funds paid to Defendants are grossly disproportionate to the services provided to the LifeTime Funds, are excessive and violate Section 36(b).

### Comparative Fee Structures

74.     The portion of the Acquired Fund Fee Defendants receive from the LifeTime Funds is much higher than the fees their competitors receive for substantially similar services.

Moreover, the portion of the Acquired Fund Fee Defendants receive from the LifeTime Funds is per se excessive because Defendants provide little or no services in exchange for the colossal fee.

75.     Other investment advisors who offer funds similar to the LifeTime Funds' model (*i.e.*, where the fund advisors hire sub-advisors to provide most of the investment management services for the funds) such as Vanguard, charge substantially less for the services at issue here than Defendants charge the LifeTime Funds.  As noted above, Defendants' affiliate, Edge, would charge the LifeTime Funds approximately one-third of the fees at issue in this case that they are paying now.  The services provided by these other advisors are the same or substantially similar advisory services that Defendants provide to shareholders of the LifeTime Funds.   Yet, Defendants charged the shareholders of the LifeTime Funds and collected more than $118 million in 2014 without any justification.

76.     Analyzing the fees paid by Defendants' to sub-advisors, or their competitors' fees, or even their affiliates' fees indicate additional ways in which Defendants have violated their fiduciary duties to the LifeTime Funds by charging them unfair and excessive fees.

77.     Defendants hired sub-advisors for all of the LifeTime Funds, who assumed the obligation of providing essentially all of the substantive investment advisory services to the LifeTime Funds.   As each sub-advisor is a for-profit investment management company that negotiated its fee with Defendants, the fees they charge provide a meaningful benchmark for the cost of the investment advisory services provided to the LifeTime Funds (and one presumably including a profit margin). Compared to the fees charged by the sub-advisors who actually perform the substantive advisory services to the LifeTime Funds, the additional fees charged by Defendants and complained of by Plaintiff here – fee monies taken from the LifeTime Funds by Defendants for little, if any additional services provided to the LifeTime Funds – are unfair and excessive.

78.     While Plaintiff does not challenge the fees paid to the sub-advisors of the LifeTime Funds, the fee rates paid to the sub-advisors do provide a measure of how much investment advisory services for the LifeTime Funds in particular actually cost (and the economies of scale

realized by the advisors), as the sub-advisors also are for-profit investment management companies. Defendants charge far more than the sub-advisors for the LifeTime Funds as concerns the Acquired Fund Fee even though, again, the sub-advisors to the LifeTime Funds assume the obligations to provide the most of the investment advisory services to the LifeTime Funds. David Swensen, the chief investment officer of Yale University, highlighted this issue in one of his books using the case of the Principal Partners LargeCap Value Fund (now known as the Principal LargeCap Value Fund III):

> Consider the case of the Principal Partners LargeCap Value Fund, one of the family of mutual funds organized by Principal Life Insurance of Des Moines, Iowa. Principal Management Corporation, the manager of the LargeCap Value Fund, actually provides no investment management services, focusing instead on "clerical, recordkeeping and bookkeeping services." Responsibility for the day-in and day-out portfolio management rests with a subsidiary of Alliance Capital Management, Bernstein Investment Research and Management.

> The fee arrangement between Principal and Bernstein involves only a portion of Principal's take from its investors. For the year ended December 31, 2003, Principal's no-load class B shares bore the burden of a 2.51 percent expense ratio . . . Investors paid a 12b-1 fee of 0.91 percent, other expenses of 0.85 percent and a management fee of 0.75 percent. Principal's fees all but guarantee that investors will fail to generate satisfactory returns.

> The management fee arrangement between Principal and Bernstein provides clues to the economies of scale available in the money management industry. At asset levels below $10 million, of the 0.75 percent management fee, 0.60 percent goes to Bernstein and 0.15 percent goes to Principal. As assets under management increase, Bernstein's fee share decreases and Principal's fee share increases. At the final breakpoint of $200 million in assets, of the scale-invariant 0.75 percent fee, Bernstein receives 0.20 percent and Principal receives 0.55 percent.

> The fee structure clearly illustrates scale economies in the investment management business. Bernstein, the party responsible for the heart of the portfolio management process, earns fees that diminish (with increases in assets under management) from 0.60 percent of assets to 0.20 percent of assets. Since Bernstein's work

> changes not at all as asset levels increase, the reduction in marginal charges makes sense.
>
> It makes no sense that Principal's mutual-fund clients accrue no benefits from economies of scale. Total expenses incurred by investors remain at 2.51 percent regardless of portfolio size. As Bernstein's management fee declines, Principal's management fee increases. For assets above $200 million Principal adds a management fee of 0.55 percent to other fees of 1.76 percent, bringing the egregious total to 2.31 percent for Principal and 0.20 percent for Bernstein. In this topsy-turvy world, Principal earns a marginal management fee of 0.55 percent for performing back-office functions, while Bernstein earns a marginal management fee of 0.20 percent for making security-selection decisions. As scale increases, Bernstein earns less while Principal takes more.

(David F. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238-240 (2005)).

79.     Put bluntly, in situations like that now before the Court, "[f]und managers . . . routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30bps for its investment advice, but the manager will then typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory fee charge to fund shareholders."  (*See* John P. Freeman, Stewart L. Brown & Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2008).  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house." (*Id*. at 118.)  **Defendants here did precisely this**, padding the fee bill to the Principal Funds at issue by nearly $118 million in fiscal year 2014 for providing few, if any additional services, beyond those already provided by the LifeTime Funds' sub-advisors and/or board members.

80.     As further illustration, Vanguard offers a similar balanced product with conservative risk — namely, the Vanguard LifeStrategy Conservative Growth Fund ("LifeStrategy"), a fund of funds that invests in other Vanguard mutual funds.  The LifeStrategy fund pays approximately 15 basis points for investment management services of the sort for which Defendants charge more than 100 basis points to the LifeTime Funds.  Further the

LifeStrategy fund out performed or performed close to on par with Defendants' analogous Principal 2020 LifeTime Fund.

### *Fallout Benefits*

81.     Defendants indirectly profit because of the existence of the LifeTime Funds through so-called fallout benefits, *i.e.*, indirect benefits to the Defendants attributable in some way to the existence of the LifeTime Funds. For example, courts have held that float revenue earned by investment advisory affiliates on free credit balances awaiting sweep into a money market fund should be considered as a fall out benefit of the adviser's contract with the money market fund.

82.     These obvious fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the LifeTime Funds.

83.     Other, easier to quantify, fallout benefits include "soft dollars" payable from broker-dealers or other service providers to mutual funds.  Essentially, "soft dollars" are credits furnished to Defendants from securities-industry firms in exchange for routing the LifeTime Funds' securities transaction orders and other business to paying firms.  In short, those soft dollars here were in reality not so soft:  Plaintiff and other investors in the LifeTime Funds paid roughly $53 million annually for core investment management services to the sub-advisors.  The soft-dollar credits resulting from the annual $53 million paid to sub-advisors should have been used to purchase research and other goods or services that would benefit the shareholders of the LifeTime Funds.  But the soft dollar arrangement at bar instead benefitted Defendants and resulted in increased costs to the shareholders of the LifeTime Funds with little to no corresponding benefits to the shareholders of the LifeTime Funds.  This self-serving use of the soft dollar mechanism by Defendants amounts to a violation of the ICA by Defendants, and judgment for Plaintiff is thus in order.

84.     Defendants may receive further fallout benefits from securities lending arrangements. Essentially, in that event, Defendants loan out the securities of the LifeTime Funds

and receive compensation as the lending agents of the LifeTime Funds.  Defendants may, in that event, reap colossal profit from this arrangement, as well.

85.     A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the LifeTime Funds at virtually no additional cost.  Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants.  Without payment by Plaintiff and the LifeTime Funds of millions of dollars in investment management and other fees, Defendants themselves would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients.  This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business.  However, although Plaintiff and other shareholders of the LifeTime Funds pay all of the costs associated with the investment advisory services, Defendants resell these services to third parties without compensating Plaintiff through reduced fees or in any other way.

86.     Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the LifeTime Funds or to the LifeTime Funds' directors.  The evidence demonstrating the validity of this allegation is believed to be within Defendants' sole possession.

87.     In sum, Plaintiff and other shareholders of the LifeTime Funds have paid for these benefits and are entitled under the ICA to compensation for those payments in the form of reduced fees for the LifeTime Funds.

### The Independence and Conscientiousness of the LifeTime Fund Directors

88.     Fees paid to Defendants are technically approved by the LifeTime Funds' Board of Directors.  A majority of the LifeTime Funds' board is comprised of statutorily presumed "disinterested" directors as that term is defined in Section 10 of the ICA.  Regardless of whether these presumably "disinterested" directors meet the requirements of Section 10 of the ICA, there

is a lack of conscientiousness by the directors in reviewing the fees paid to Defendants by each of the LifeTime Funds.

89.     The materials provided by Defendants to the directors of the LifeTime Funds establish that the nature of the services Defendants render to the LifeTime Funds.  These materials have remained largely unchanged despite dramatic growth in the assets of the LifeTime Funds and fee revenues.

90.     In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiff and other shareholders of the LifeTime Funds.  In particular, Defendants do not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

91.     The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the LifeTime Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the fees received by Defendants.  Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services.  (*See* GAO Report at 14.) These responsibilities are intensive, requiring the directors to rely on information provided by Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.  *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

92.     The ICA contains a presumption that the disinterested directors are in fact disinterested.   However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the LifeTime Funds, the lack of adequate information provided to the directors in connection with their approvals of the operative agreements and, the control of management over the directors in reviewing the fees paid by the LifeTime Funds are not presumed but, rather, are important factors in determining whether Defendants have breached

their fiduciary duties.  In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser.  For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." (Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444, at *36 (Oct. 28, 1980)).

93.     Defendants' $118 million windfall complained of herein indicates prima facie that Defendants did not keep genuinely disinterested and independent directors of the LifeTime Funds fully informed regarding all material facts and aspects of their fees and other compensation.  A truly independent board of directors would not have tolerated the complained-of fee assessment charged by Defendants if it had obtained adequate information regarding, among other things: the sub-advisory fees Defendants paid for the LifeTime Funds and the services received by the LifeTime Funds from Defendants for fees they charged; the advisory fees charged and services provided by competitors with similar fund structures; the advisory fees and services provided to Defendants' pension and other institutional clients; the economies of scale enjoyed or fallout benefits received by Defendants; the profitability data, and how to evaluate the profitability data in light of economies of scale.

94.     As aforementioned and documented, mutual fund boards of directors rarely, if ever, question any information or recommendations provided by mutual fund investment advisors.  The evidence needed to establish the truth of these allegations is believed to be exclusively in the control of Defendants and is not in Plaintiff's possession at this time.

95.     The boards of directors of the LifeTime Funds are materially dependent on Defendants for information concerning the investment and fee structure that applies to the LifeTime Funds and thus ineluctably has allowed Defendants to dominate and unduly influence the various boards' directorship of the funds.

## COUNT I
## ICA §36(b)
## BREACH OF FIDUCIARY DUTY
### (Unfair and Excessive Fees)

96.     Plaintiff repeats and re-alleges each allegation contained in the foregoing paragraphs of this complaint as of if fully set forth herein.

97.     The fees charged by Defendants for providing advisory services to the LifeTime Funds represent a breach of Defendants' fiduciary duty to the LifeTime Funds because they are unfair, excessive, and were not negotiated at arm's length in light of all the surrounding circumstances.  Plaintiff specifically alleges that all unfair and excessive fees alleged herein have inured to the benefit of, and been received by, Defendants.

98.     In charging and receiving inappropriate compensation, and in failing to put the interests of Plaintiff and the other shareholders of the LifeTime Funds ahead of their own interests, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiff in violation of ICA § 36(b), both as a result of a flawed negotiating process and with respect to the substantive amounts of the fees.

99.     Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the LifeTime Funds or, pursuant to 15 U.S.C. § 80-46(b) ("§ 47(b) of the ICA"), rescission of the contracts.

WHEREFORE, Plaintiff demands judgment as follows:

a.      An order declaring that Defendants have violated and continue to violate § 12, 36(b), of the ICA and that any advisory, administrative, or service agreements entered into are void ab initio;

b.      An order preliminarily and permanently enjoining Defendants from further violations of the ICA;

c.      An order awarding damages against Defendants including all fees paid to them by Plaintiff and the LifeTime Funds for all periods not precluded by any applicable

statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

d.      Such other and further relief as may be proper and just.


Dated: September 3, 2015

/s/ J. Barton Goplerud
J. Barton Goplerud
**HUDSON MALLANEY SHINDLER & ANDERSON PC**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887

Todd M Schneider
Garrett W. Wotkyns
Mark T. Johnson
Michael C. McKay
Kyle G. Bates
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0143
Facsimile: (866) 505-8036

Daniel J. Carr
**PEIFFER ROSCA ABDULLAH CARR & KANE**
201 St. Charles Avenue, Suite 4610
New Orleans, Louisiana 70170
Telephone: (504) 523-2434
Facsimile: (504) 523-2464

Richard S. Frankowski
**The Frankowski Firm**
231 22nd Street South, Suite 203
Birmingham, Alabama 35233
Telephone: (205) 390-0399
Facsimile: (205) 390-1001

Peter J. Mougey
Laura Dunning
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY &
PROCTOR**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7121
Facsimile: (850) 436-6147

Attorneys for Plaintiff